# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person, property, or object to be tracked )*<br><br>Early 2000's 4-door Tan/Brown, Buick Lesabre with<br>blank/black license plate front mount, circular "Stark"<br>sticker on rear driver's side & NOT bearing any vehicle<br>registration license plate with unknown VIN | )<br>)<br>)   Case No.25-839M(NJ)<br>)<br>)<br>) |

## TRACKING WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government shows there is reason to believe that the person, property, or object described above has been involved in and likely will continue to be involved in the criminal activity identified in the application, and  ☑ is located in this district;     ☐ is not now located in this district, but will be at execution;  ☐ the activity in this district relates to domestic or international terrorism;     ☐ other:                                    .

I find that the affidavit(s), and any recorded testimony, establish probable cause to believe that *(check the appropriate box)*  ☐ using the object     ☑ installing and using a tracking device to monitor the location of the person, property, or object will satisfy the purpose set out in Fed. R. Crim. P. 41(c) for issuing a warrant.

☑ I find entry into the following vehicle or onto the following private property to be necessary without approval or knowledge of the owner, custodian, or user of the vehicle or property for installing, maintaining, and removing the tracking device: An Early 2000's 4-door Tan/Brown, Buick Lesabre with blank/black license plate front mount, circular "Stark" sticker on rear driver's side & NOT bearing any vehicle registration license plate with unknown VIN (Subject Vehicle), located at 2866 N. 23rd Street, Milwaukee, Wisconsin.

**YOU ARE COMMANDED** to execute this warrant and begin use of the object or complete any installation authorized by the warrant by 3/10/2025                *(no later than 10 days from the date this warrant was issued)* and may continue to use the device until 4/14/2025                *(no later than 45 days from the date this warrant was issued)*.  The tracking may occur within this district or another district.  To install, maintain, or remove the device, you may enter *(check boxes as appropriate)*

☐ into the vehicle described above     ☑ onto the private property described above
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Within 10 calendar days after the use of the tracking device has ended, the officer executing this warrant must both return it to *(United States Magistrate Judge)*             Hon. Nancy Joseph             and — unless delayed notice is authorized below — serve a copy of the warrant on the person who, or whose property or object, was tracked.

☑ Pursuant to 18 U.S.C. § 3103a(b)(1), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and this warrant prohibits the seizure of any tangible property or any wire or electronic communications (as defined in 18 U.S.C § 2510).  I therefore authorize the officer executing this warrant to delay notice to the person who, or whose property or object, will be tracked *(check the appropriate box)*
☑ for      30      days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of                    .

Date and time issued: 2/28/2025 @ 1:07 p.m.

*Judge's signature*

City and state:    Milwaukee, Wisconsin                Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

Case No.

## Return of Tracking Warrant With Installation

1. Date and time tracking device installed: _____

2. Dates and times tracking device maintained: _____

3. Date and time tracking device removed: _____

4. The tracking device was used from *(date and time)*: _____

   to *(date and time)*: _____ .

## Return of Tracking Warrant Without Installation

1. Date warrant executed: _____

2. The tracking information was obtained from *(date and time)*: _____

   to *(date and time)*: _____ .

## Certification

I declare under the penalty of perjury that this return is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Case 2:25-mj-00839-NJ    Filed 02/28/25    Page 2 of 23    Document 1

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person to be tracked or describe*<br>*the object or property to be used for tracking)*<br>Early 2000's 4-door Tan/Brown, Buick Lesabre with<br>blank/black license plate front mount, circular "Stark"<br>sticker on rear driver's side & NOT bearing any<br>vehicle registration license plate with unknown VIN | )<br>)<br>)<br>)<br>)<br>)    Case No. 25-839M(NJ) |

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of ___21___ U.S.C. § __841 & 846__ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☑ property designed for use, intended for use, or used in committing a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:
Early 2000's 4-door Tan/Brown, Buick Lesabre with blank/black license plate front mount, circular "Stark" sticker on rear driver's side & NOT bearing any vehicle registration license plate with unknown VIN, located at 2866 N. 23rd Street, Milwaukee, WI.

☑ Delayed notice of 30 days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Aaron Hoppe, DEA TFO

*Applicant's printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/28/2025

*Judge's signature*

City and state:   Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter No.**

I, Aaron Hoppe, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to install and monitor an electronic tracking device to determine the location of a vehicle more particularly described as **an early 2000's four-door, Tan/Brown, Buick Lesabre sedan, with a blank/black license plate front mount, and black oval/circular sticker with the letters "Stark" attached to the rear driver's side of the vehicle, and NOT bearing any vehicle registration license plate, with an unknown VIN** (herein referred to as "**the Subject Vehicle**") and depicted below:



**Case agent's note: This is a surveillance photograph of the actual Subject Vehicle**

2.      Based on the facts set forth in this affidavit, I believe that the **Subject Vehicle** is presently being used in furtherance of violations Title 21, United States Code, sections 841 and 846, and that there is probable cause to believe that the installation of an electronic tracking device

Page 1

on the **Subject Vehicle** and use of the tracking devices will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3. I have been a law enforcement officer since May 30, 2007. I am currently assigned to the Waukesha County Sheriff's Department Detective Bureau. I have been assigned to a Federal Drug Task Force (Milwaukee HIDTA) and have been assigned to the Waukesha County Metro Drug Unit in 2012-2013, 2015-2017, and from 2022-Present. I have been a part of hundreds of state and federal investigations related to drug activity.

4. I am currently a Federal Task Force Officer with the Drug Enforcement Administration (DEA) and have been since February 7, 2023. During my tenure as a Task Force Officer, I have been involved primarily in the investigation of large-scale narcotics traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States based upon the direction of my and/or other investigations that arise through the Milwaukee District Office of the DEA.

5. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants,

Page 2

undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. I have received extensive training in death investigations, narcotics investigations, cell phone analytics, and I am currently a member of the Board of Directors for the Wisconsin Association of Homicide Investigation. I have investigated drug trafficking offenses at the state and federal level, including violations of Title 18, United States Code, Section 922(o) and Title 21, United States Code, Sections 841 and 846.

6.     Based on training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

> a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.
>
> b.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances. I know it is common that those individuals engaged in drug trafficking often use more than one

cellphone. This is done to attempt to insults a drug trafficker and to evade law enforcement detections.

c. I know that it is common for persons involved in the sales of controlled substances to be armed with guns and/or to keep firearms in their residence/apartment for their protection and the protection of their controlled substances.

d. It is a common practice for individuals engaged in high level drug trafficking activities to use multiple locations to conduct their drug trafficking activities. For example, a "stash house" is a location used to store controlled substances, firearms, and U.S. Currency.

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

g. I know it is common for persons involved in large-scale drug trafficking and related financial crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years. These items are maintained by the traffickers within residences, stash houses, vehicles, or other locations over which they maintain dominion and control.

h. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase

Case 2:25-mj-00839-NJ    Filed 02/28/25    Page 7 of 23    Document 1

of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them.

i.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time.  It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

j.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

k.  Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons.  However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

l.  I know large-scale drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities.

m.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant

Case 2:25-mj-00839-NJ    Filed 02/28/25    Page 8 of 23    Document 1

services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

n. I know that the Currency Transaction Report (CTR) (FinCen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s).

p. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

q. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer

Page 6

Case 2:25-mj-00839-NJ    Filed 02/28/25    Page 9 of 23    Document 1

access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

7. Based on my training and experience, I know that persons involved in the distribution of controlled substances often use vehicles to store, transport, and distribute said substances. Further, I know that drug traffickers often use vehicles under their control to travel to meet drug customers, drug sources of supply, or other co-conspirator and/or to visit "stash" locations where controlled substances are stored. I know that tracking the location of a drug trafficker's vehicle can reveal said drug "stash" locations and identify other persons with whom the trafficker is involved in the drug trade.

8. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with an informant, whose reliability is established separately herein.

9. The investigation to date has included traditional law enforcement methods, including, but not limited to: information from other law enforcement officers; recorded conversations; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for the requested warrant, I have not included each and every

Page 7

fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested warrant.

10. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of possession with intent to distribute controlled substances, conspiracy to possess with the intent to distribute/distribute controlled substances, and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Sections 841, 843(b), and 846, have been committed, are being committed, and will be committed by Montrell D. HILSON and other identified and unidentified subjects. There is also probable cause to believe that the location of the **Subject Vehicle** will constitute evidence of those criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## **PROBABLE CAUSE**

11. The United States government, including the HIDTA, DEA, Waukesha County Sheriff's Department and the Waukesha County Metro Drug Unit, is conducting a drug trafficking investigation of Montrell D. HILSON and other identified and unidentified individuals for violations of illegal possession with intent to distribute controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843.

12. During a debrief with a DEA CS (Herein referred to as CS-1), CS-1 provided case agents with information concerning two individuals that were selling large amounts of heroin/fentanyl and methamphetamine. CS-1 provided information that one of the individuals had recently been indicted in a federal investigation and was "the only one released" from custody.

Page 8

CS-1 provided a nickname for this individual as "Droop." The CS-1 provided information regarding the second individual as "Nut" and stated that "Nut" and "Droop" are family members of the co-defendants who were federally indicted with "Droop." CS-1 advised that the basis of CS-1's knowledge concerning the drug trafficking of "Droop" and "Nut" comes from CS-1's own personal observations.

13. Case agents believe that CS-1 is credible and reliable. CS-1 has provided information concerning individuals involved in illegal activities which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS-1 has no arrests or convictions relating to dishonesty but has past arrests or convictions for felony drug offenses, inducing Possession with intent to deliver Cocaine, Possession with intent to deliver/manufacture a controlled substance, Manufacture/deliver cocaine, Possession of THC, Possession with Intent Heroin, and Maintaining a Drug Trafficking place. CS-1 currently has an open case through Waukesha County for felony Battery and Bail jumping charges, and misdemeanor traffic offenses. CS-1 is cooperating with case agents in hope of receiving consideration for CS-1's open/pending Waukesha County criminal and traffic case(s). As detailed below, CS-1 conducted two controlled buys from HILSON on behalf of law enforcement. The information provided by CS-1 concerning what occurred during each of these buys was corroborated by case agent surveillance and/or review of covertly recorded audio and/or video made by CS-1 of the transactions at the request of case agents. CS-1's information has never been found to be false or misleading. For these reasons, I consider CS-1 to be reliable.

14. Case agents previously identified "Droop" as Maurice F. HAMPTON Jr., who was federally indicted in the Eastern District Court of Wisconsin on February 7, 2024, for charges

Page 9

related to the possession and distribution of controlled substance, knowingly and intentionally using a communication facility, namely, a telephone in facilitating the commission of an act and acts constituting a felony, knowingly possessing firearms in furtherance of a drug trafficking offense, in violation of Title 21, United States Code, Section 841(a)(1), 841(b), and 843(b) and Title 18, United States Code, Sections 2(a) and 924(c)(1)(A)(i). HAMPTON Jr. was taken into custody on February 7, 2024, but was released a short time after his initial court appearance. Consistent with CS-1's information, HAMPTON Jr.'s charged co-defendants in that case were ordered detained and HAMPTON Jr. is the only defendant, to date, to be released from custody. Further, also consistent with CS-1's information, many of HAMPTON Jr.'s charged co-defendants are related to each other or maintain a family-like relationship according to my knowledge of that investigation.

15. Case agents identified the second individual ("Nut") as Montrell HILSON. Case agents had previous contacts with HILSON, who had acknowledged that he goes by "Nut." Case agents had previously identified HILSON and HAMPTON Jr., as family members of Qian COLLINS and multiple other defendants in the same indictment as HAMPTON Jr. Case agents then showed previously obtained pictures of HILSON and HAMPTON Jr. to CS-1 who positively identified HILSON as "Nut" and HAMPTON Jr. as "Droop."

16. CS-1 stated that CS-1 has regular communication with HILSON, via phone conversations, where HILSON provides this information to CS-1. CS-1 indicated that CS-1 has known HILSON for several years, and HILSON "trusts" CS-1 enough to provide information regarding his (HILSON) illegal narcotic trafficking, including when they (HILSON and HAMPTON) pick up heroin and/or fentanyl, where it is being stored, and how much illegal narcotics are being purchased and sold.

Page 10

17. CS-1 was able to identify a "stash" house currently being utilized by HILSON and HAMPTON as 2866 N. 23rd Street, in the City of Milwaukee, Wisconsin. CS-1 stated that either HILSON or HAMPTON Jr., travel to Chicago every 5-7 days to purchase multiple kilograms of heroin/fentanyl and transport it back to the Milwaukee area, where it is "cut" into several additional kilos and prepared for distribution. Case agents know this to mean that the purchased heroin/fentanyl, is mixed with different types of "cutting" agents, such as lactose, which is then mixed to create a larger amount of illegal narcotics to distribute.

18. CS-1 was unable to provide any further details regarding the source of supply or destination in the Chicago area, where HILSON or HAMPTON Jr. go to retrieve the heroin/fentanyl.

19. Case agents learned from reviewing online Wisconsin Circuit Court records (CCAP) that: HILSON was convicted in Waukesha County on August 16, 2016, in case 2016CF000991, with Possession with Intent to Deliver- Heroin (3-10 grams) in violation of Wisconsin State Statute 961.41(1m)(d)2 with a dangerous weapon modifier 939.63(1)(b).

20. Case agents learned from reviewing online Wisconsin Circuit Court records (CCAP) that: HILSON was convicted in Milwaukee County on August 21, 2018, in case 2018CF003956, with Possession of a firearm by a Felon in violation of Wisconsin State Statute 941.29 (1m)(a) with mandatory minimums-repeat firearms crimes modifier 939.6195(2) and Habitual Criminal Repeater modifier 939.62(1)(b) and Possession of Narcotic Drugs in violation of Wisconsin State Statute 961.41(3g)(am).

21. Case agents learned that HILSON is on active Extended Supervision through the Wisconsin Department of Corrections (WI DOC) and was released from the Kettle Moraine Correctional Institution on June 13, 2023.

22.     Case agents learned that HILSON reported to WI DOC that he is residing at his mother's residence located at 5105 N. 21st Street in the City of Milwaukee and provided a telephone number of 414-567-8450 as a number he is currently using.

23.     Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is often wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs or firearms and the recording/monitoring equipment to the case agents. When an informant is used, the informant is again searched for contraband, weapons, and money.

24.     On November 26, 2024, CS-1, purchased approximately 20.0 grams of suspected fentanyl in exchange for $550.00 in pre-recorded US Currency from an individual later confirmed to be HILSON.  During the transaction, which occurred in the area of N. 35th Street and W. Burleigh Street in Milwaukee, Wisconsin, HILSON was observed by case agents exiting a business (Frank's Hand Car Wash at 3121 N. 36th Street, in the City of Milwaukee).  HILSON entered CS-1's vehicle and completed the transaction with CS-1.  HILSON was observed by case agents exiting CS-1's vehicle and entering the business after the transaction.  Case agents positively identified HILSON as the individual who completed the transaction with CS-1.  CS-1 confirmed that while in CS-1's vehicle, HILSON supplied CS-1 with a quantity of suspected drugs and identified "Nut" as the person who completed the transaction with CS-1.  Case agents were unable to identify a vehicle possibly being utilized by HILSON during that transaction.  CS-

Page 12

1 provided the quantity of suspected fentanyl provided to CS-1 by HILSON to case agents.

25. Case agents reviewed recordings of the transaction and were able to decipher that CS-1 and HILSON were discussing prices of larger amounts of fentanyl during the transaction. Case agents reviewed CS-1's telephone and observed that the number CS-1 utilized to contact HILSON to complete the transaction was 414-627-8881.

26. Case agents did search CS-1 prior to and after the transaction to ensure that there were no monies or contraband on CS-1 or inside of CS-1's vehicle. CS-1 was under constant surveillance and was never out of view of case agents during the transaction.

27. Casse agents received the laboratory report for the suspected fentanyl that was purchased from HILSON on November 26, 2024, and the report indicated that the "primary drug" was 19.9 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (Fentanyl), with "All other reported drugs" being N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (Fentanyl), Heroin, Xylazine, and Trazadone.

28. On December 19, 2024, CS-1 purchased 24.2 net grams of suspected fentanyl in exchange for $700.00 in pre-recorded US Currency from an individual later confirmed to be HILSON. The transaction occurred in the rear of a business identified as Capitol Nails and Salon located at 5033 W. Capitol Dr in the City of Milwaukee. During the transaction, HILSON was driven to the location by an individual later identified as Thomas TERRY, in a 2017 Black Ford Focus, bearing WI registration AAV3674, which is registered to TERRY. Upon arrival to the location, HILSON, who was the front seat passenger in the Focus, contacted CS-1 and instructed CS-1 to enter the vehicle HILSON was in. As CS-1 approached the vehicle, TERRY (the operator) exited the front driver's seat and CS-1 entered the front driver's seat as TERRY walked away. Case agents were able to positively identify TERRY during that time.

Page 13

29.     During the duration of the drug transaction, HILSON had rolled the front passenger window down to the point where case agents were able to positively identify him through the front passenger window.  After the transaction was completed, CS-1 exited the Focus and TERRY was observed re-entering the FOCUS.  CS-1 confirmed that while inside the FOCUS, HILSON provided CS-1 with a quantity of suspected fentanyl in exchange for the pre-recorded buy money.  CS-1 confirmed that HILSON was the individual with whom CS-1 conducted the transaction.  CS-1 provided the quantity of suspected fentanyl provided to CS-1 by HILSON to case agents.  Case agents reviewed CS-1's telephone and observed that the number CS-1 utilized to contact HILSON to complete the transaction was 414-627-8881.

30.     Case agents did search CS-1 prior to and after the transaction to ensure that there were no monies or contraband on CS-1 or inside of their vehicle.  CS-1 was under constant surveillance and was never out of view of case agents during the transaction.

31.     Case agents received the laboratory report for the suspected fentanyl that was purchased from HILSON on December 19, 2024, and the report indicated that the "primary drug" was 23.10 grams of Heroin with "All other reported drugs" being, N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (Fentanyl) and Xylazine.

32.      Case agents then followed the Focus (being operated by TERRY) as it drove directly to the residence located at 2866 N. 23rd Street in the City of Milwaukee.  Case agents observed HILSON exit the vehicle and enter the rear of the residence located at 2866 N. 23rd Street.  The Focus was observed by case agents leaving the area after HILSON entered the residence.

33.     Case agents have occasionally conducted surveillance at the residence located at 2866 N. 23rd Street for several months (from November 2024 through February 2025).  During

Page 14

this time, case agents observed an early 2000's tan/brown Buick Lesabre (**the Subject Vehicle**) parked in the rear of the residence located at 2866 N. 23rd Street in the City of Milwaukee. Case agents observed that there was no visible vehicle registration and no other identifying markings which would assist in trying to identify who the vehicle is registered to. Case agents checked Law Enforcement databases and public databases and could not find any Buick associated to HILSON. For this reason, case agents are not able to further describe the **Subject Vehicle** beyond make and model because they cannot discern the year or VIN. However, the **Subject Vehicle** is a four-door sedan with a blank/black license plate front mount and gray hub caps on each of the wheels. There is a black oval/circular sticker attached to the rear of the vehicle, on the driver's side, with the letters "Stark" written on it. Case agent did not observe any significant damage or other markings on the vehicle.

34. On October 28, 2024, case agents conducting surveillance at 2866 N. 23rd Street observed HAMPTON Jr. in front of the residence. HAMPTON Jr. was a front seat passenger in a Black Chevy Malibu with no visible registration. On October 29, 2024, case agents conducting surveillance at 2866 N. 23rd Street observed HILSON exit the residence and make contact with the operators of two vehicles that were parked in front of the residence. On January 20, 2025, case agents observed the **Subject Vehicle** parked in the rear of the residence (2866 N. 23rd Street) in a parking slab.

35. On February 21, 2025, case agents were conducting surveillance and observed an unknown white male operating a 2015 Infiniti bearing WI registration AYT-6191, pull up to the residence at 2866 N. 23rd Street, exit the vehicle, and walk to the rear door of at 2866 N. 23rd Street. Case agents observed HILSON open the door and conduct a hand-to-hand transaction with the unknown male. Based on case agents training and experience in drug investigations,

Page 15

case agents believe the contact between HILSON and the unknown male was a transaction for illegal narcotics based on the behaviors observed which is indictive of a commonly used method to conduct drug transactions. The white male then returned to his vehicle before driving away. Case agents learned that this vehicle was registered to a subject named Lonnie SMITH, who was not the individual observed by case agents conducting the hand to hand (i.e., not the unknown white male). The Infiniti has a registered Wisconsin DOT address of 1212 W. Keefe Avenue #1, Milwaukee, Wisconsin. This address is significant as case agents learned that HAMPTON Jr. was arrested by the Milwaukee Police Department in 2018 in possession of fentanyl at 1212 W. Keefe Avenue.

36. On February 24, 2025, case agents were notified by CS-1 that HILSON had reached out to CS-1, via phone call, and told CS-1 that he (HILSON) had just purchased 250 grams of fentanyl and was able to sell CS-1 any amount that was needed. In addition, HILSON informed CS-1 that he (HILSON) had observed a "suspicious van" recently and moved the fentanyl to a house in the area of N. 19th Street and W. Hampton Ave in the City of Milwaukee.

37. Case agents believe that HILSON was referring to the February 21, 2025 incident where he confronted the case agent conducting surveillance. The case agent who was confronted was in fact operating a minivan when confronted by HILSON, and this information was not shared with CS-1 by law enforcement. This leads case agents to believe the information HILSON provided to CS-1 was accurate and truthful.

38. A few minutes later, HILSON exited the residence and entered the front driver's seat of the **Subject Vehicle** and backed out of the parking slab in the rear of the residence where it had been parked. HILSON then drove up to a vehicle being operated by case agents and rolled down the driver's side window and asked the case agent what they were doing in the area. After

Page 16

a short conversation, HILSON drove off, but case agents confirmed that HILSON was the operator and sole occupant of the **Subject Vehicle** during this interaction.

39.     Based on the physical surveillance, I believe that HILSON is using the **Subject Vehicle** in connection with drug trafficking.  HILSON twice sold drugs to CS-1 and then, within the last week, engaged in what I believe to be a drug transaction with an unknown male and then, shortly thereafter, entered into the **Subject Vehicle**.  HILSON then operated the **Subject Vehicle** when he made contact with undercover surveillance, who were present in the area of his residence (where the apparent drug deal had just occurred).   After that contact, HILSON informed CS-1 that he had just purchased 250 grams of fentanyl and had moved the fentanyl to a new location after confronting a case agent conducting undercover surveillance.  Case agents have not observed any additional vehicles associated to HILSON and case agents have only observed HILSON operating the **Subject Vehicle**. Case agents know based on information provided by CS-1 that HILSON has been directly involved in the sale and transportation of fentanyl and believe that HILSON has a new "stash" location in the area of N. 19th Street and W. Hampton Ave.  Case agents now believe that HILSON is very mindful of vehicles around him and are concerned about further surveillance.  Thus, I believe that the GPS would be beneficial in further identifying the "stash" location. Based upon my own observations, I know that the **Subject Vehicle** is presently within the Eastern District of Wisconsin.

40.  Law enforcement have observed HILSON using the **Subject Vehicle** on February 21, 2025, after the completion of a suspected hand to hand drug transaction between HILSON and an unknown individual.   Law enforcement believes, based on the foregoing, that the **Subject Vehicle** is presently within the Eastern District of Wisconsin.

Page 17

41.  In order to track the movement of the **Subject Vehicle** effectively and to decrease the chance of detection, law enforcement seeks authorization to place a tracking device on the **Subject Vehicle** while it is in the Eastern District of Wisconsin. Because HILSON parks the **Subject Vehicle** in a parking slab in the rear of 2866 N. 23rd Street, Milwaukee, Wisconsin, it may be necessary to enter onto private property (specifically the parking slab in the rear of 2866 N. 23rd Street, Milwaukee, Wisconsin) and/or move the **Subject Vehicle** to affect the installation, repair, replacement, and removal of the tracking device.

42.  To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. I know through training and experience that DTO suppliers are often surveillance conscious, and, in fact, in this case, HILSON approached undercover surveillance officers while operating the **Subject Vehicle** to inquire why they were present in the area. Further, the parking slab area in the rear of 2866 N. 23rd Street is fully visible from nearby residences, increasing the risk of detection if law enforcement attempted to install the GPS in broad daylight.  Finally, HILSON's criminal history includes allegations involving firearms/dangerous weapons. Law enforcement also requests delayed notice of this warrant for the similar reasons, primarily that premature disclosure of the existence of this order would jeopardize the ongoing investigation and may lead targets to destroy evidence or flee the jurisdiction. Finally, law enforcement requests permission to enter the **Subject Vehicle** in order to install the device contemplated here. Law enforcement will not enter the **Subject Vehicle** to install the device unless such entry is ultimately required to effect installation.

Page 18

**AUTHORIZATION REQUEST**

43. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 authorizing periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

44. It is further requested that in the event that the **Subject Vehicle** travels outside the territorial jurisdiction of the court, the order authorize the continued monitoring of the electronic tracking device in any jurisdiction within the United States, pursuant to 18 U.S.C. § 3117.

**CONCLUSION**

45. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes law enforcement, including but not limited to your affiant and technicians assisting in the above-described investigation, to install a tracking device on the **Subject Vehicle** within the Eastern District of Wisconsin within 10 days of the issuance of the proposed warrant; to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **Subject Vehicle** after the use of the tracking device has ended: to install, maintain, and remove the tracking device during both daytime and nighttime hours; to surreptitiously enter the property of 2866 N. 23rd Street, Milwaukee, Wisconsin and/or move the **Subject Vehicle** to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Eastern District of Wisconsin.

Page 19

46. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of the subject vehicle would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

Page 20